## Eliza J. Schooley et al., Appellants, *v.* Butler Mine Co.

*Mines and mining—Coal lease—Royalties.*

Where a coal lease provides for a minimum production of a certain number of tons per year, and nothing is said in the lease as to the sizes of the coal constituting the minimum annual production, it may be inferred that the parties intended that the minimum number of tons to be paid for were intended to be made up of the different sizes of coal produced in the proportion that they are produced by the ordinary, usual and careful mining and preparation of coal in accordance with the terms of the agreement.

*Mining lease—Construction—Royalties.*

A mining lease of coal lands required the lessee to mine annually at least 40,000 tons after a given date, the royalties thereon to be paid in equal monthly installments; and required 20,000 tons to be mined prior to that date, on which as royalties, $5,000 were reserved, payable "in advance." The provisions of the lease showed that it was made with the fact in view that in ordinary coal mining different sizes of coal were produced; and the lease provided that royalties on prepared coal should be 25 cents per ton on all sizes larger than pea coal, and that on pea coal and smaller sizes they should be graduated according to the prices received for them at the mine; and that, where coal was shipped without being prepared, a royalty of 25 cents per ton should be paid; but in no place was it provided at what rate, or in what proportion, the minimum number of tons to be mined after said date was to be paid for.  *Held,* that the minimum number was to be made up of the different sizes of coal produced in the proportion that they were produced by the ordinary and careful mining and preparation of coal; and that the different sizes making up the whole number should be paid for at the rate fixed in the agreement for each size mentioned therein.

Argued April 15, 1896. Appeal, No. 313, Jan. T., 1896, by plaintiffs, from judgment of C. P. Luzerne Co., Jan. T., 1896, No. 80, in case tried by the court without a jury. Before STERRETT, C. J., GREEN, WILLIAMS, McCOLLUM and MITCHELL, JJ. Affirmed.

Assumpsit to recover royalties of a coal lease.

The case was tried by GUNSTER, J., of the 45th judical district, specially presiding, without a jury under the act of April 22, 1874.

The opinion of the court was as follows:

This is an action of assumpsit brought by the plaintiffs against the defendant to recover certain royalties which they allege accrued on a coal lease and were not paid. There are no facts in dispute, and the only question in the case is one of law turning upon the construction of the written agreement of the parties, and that is whether the lessees are bound under the agreement to pay monthly for at least one twelfth of forty thousand tons of coal of a size larger than pea coal at the rate specified in the agreement for coal of said size, that is at the rate of 25 cents a ton, or whether the monthly payment of at least one twelfth of forty thousand tons of all coal regularly produced regardless of size at the rate specified in the agreement for different sizes is sufficient compliance with this agreement in that respect on the part of the lessees.

### STATEMENT OF FACTS FOUND.

1. By agreement in writing bearing date the 2d day of January, A. D. 1882, and entered into by and between Jesse B. Schooley and others, as parties of the first part, and Nelson Cowan and F. C. Dininny, as parties of the second part, the said parties of the first part demised, leased and to mine let unto the said parties of the second part, their heirs and assigns, all the anthracite and mineral coal in the several veins or seams in, under and upon a tract, piece and parcel of land situate in the township of Exeter, county of Luzerne, and state of Pennsylvania, containing one hundred acres and one hundred and thirteen perches of land, more or less, which land contains, or is supposed to contain, at least four workable veins of anthracite coal throughout the whole extent thereof, which coal the

parties of the second part were desirous of mining and disposing of for their own use and benefit.

The question in dispute must necessarily be determined by a consideration of the whole instrument. I do not think it necessary, however, to transcribe the whole of it here. After the formal demising, leasing and to mine letting, it contains twenty-two articles. Some of these have a more direct bearing upon the question than others, and these will be quoted at large.

2. The defendant was not a party to the foregoing agreement of January 2, 1882.

3. Article 22 of said agreement is as follows, to wit: "All and singular the grants, covenants, agreements and undertakings hereinbefore contained and made, or which are to be kept and performed by the parties of the first part, shall be binding upon each and every of them, their heirs, executors, administrators and assigns, and inure to the benefit of the said parties of the second part, their heirs, and assigns; and all and singular the grants, covenants, agreements and undertakings hereinbefore contained which are to be kept and performed by the said parties of the second part, shall be binding on them, their heirs and assigns, and shall inure to the benefit of each and every of the said parties of the first part, their and each of their heirs, executors, administrators and assigns."

4. The interest of the said parties of the second part in and to said agreement have through mesne assignments become vested in the present defendant, the Butler Mine Company, Limited, and from and including April, 1893, to January 1, 1896, they have carried on mining operations thereunder on said land.

5. Article 2 of said agreement is as follows, to wit: "The parties of the second part shall pay to the parties of the first part down in hand at the execution of this agreement, and on account of the same, the sum of $5,000 as an advance payment on the coal to be mined and taken out and disposed of under this agreement, and they shall be allowed two years, or until the first day of January, A. D. 1884, to mine and take away said coal, and in which to make and build and put in operation the shaft, breaker, buildings, machinery, erections and improvements in the foregoing article named and provided, before being required to make payment for any more coal than they shall

actually mine, take away and dispose of from the said lands; and for the next year thereafter, or the third year under this lease, they shall pay for at least thirty thousand tons of coal, and in each and every year thereafter shall pay for at least forty thousand tons of coal, and as much more as they shall mine and take away from the said lands until all the coal in, under and upon said lands shall be mined, taken out and disposed of and paid for under this agreement.    The five thousand dollars paid down is to be allowed and accounted for out of the coal mined, taken away and disposed of prior to the first day of January, A. D. 1884."

6. Article 4 of said agreement is as follows, to wit: " For the purpose of ascertaining the amount of coal to be accounted for and paid for under this agreement, as to the broken and prepared coal, one thousand tons of two thousand and two hundred and forty pounds each of unbroken and unprepared coal in the same state and condition in which it comes from the mines in the cars, weighed at the head of the breaker, shall be taken at the commencement of each year, and of each quarter year thereafter, if required by either or any of the parties hereto, and be run through the breaker and screens at the works in the ordinary manner, and at the usual rate of speed, not exceeding thirteen revolutions per minute, by a competent person chosen by the parties hereto for that purpose, and after being so broken and screened through a screen arranged for screening, and passing through the various sizes of coal from a size below pea coal, which is a coal of a size that passes over a half inch mesh and through a three-fourth inch mesh in a screen, up through the various sizes to a size that will pass through a mesh that shall be two and one-fourth inches over in the clear; all of the larger sizes which pass over the last named size of mesh and out at the end of the screen, to be rebroken, rescreened through a screen having the same meshes as above named, and the coal picked clean of slate and prepared in marketable shape and condition, when all of the various kinds and sizes of coal resulting therefrom after going through these processes shall be weighed separately and an account of each and all the kinds and sizes taken, and the product in weight of the different kinds and sizes shall be taken as the product resulting or to result from each one thousand tons of coal thereafter mined, as it comes

from the mines and is weighed at the head of the breaker, and broken and screened as hereinbefore provided, for the three months following, including the time employed in the before mentioned work of breaking and screening, and until another trial or test of weight as aforesaid be made; and the coal mined, taken out and broken, and screened as aforesaid, shall be settled and paid for on this basis as to quantity, reckoning and counting in all cases twenty-two hundred and forty pounds for a ton. All lump coal, or coal as it comes from the mines, unbroken, unscreened, and not prepared as hereinbefore provided, which is sold and shipped by the parties of the second part in that condition, shall be accounted and paid for at the same weight and for the same number of tons that they, the parties of the second part, shall sell and ship the same for, not exceeding twenty-two hundred and forty pounds for a ton, and the said parties of the second part are to take from these lands the same proportionate quantity of lump coal that they take from their other operations in the valley."

7. Article 5 of said agreement is as follows, to wit: " The said parties of the second part are to account and pay for the said coal by them mined and taken away, in lawful money, the sum of twenty-five cents per ton of twenty-two hundred and forty pounds for all coal above the size of pea coal, or coal of a size that passes over a mesh in the screen of one half an inch in the clear, and that passes through a mesh in the screen that is three fourths of an inch in the clear, which latter size is to be rated and paid for at a price in exact ratio or proportion to the price or amount it is worth or will sell for at the works, with what the larger sizes rate at, sell for, or are worth at the same place, after the following manner to wit:—When pea coal is worth and sells for one fourth as much as the larger sizes, its price or value shall be worth one fourth that of larger sizes; when worth one third as much, then one third; when one half as much, then one half of the price of the larger sizes, and so on for any other ratio that may exist between the price or value of the said pea coal and coal of the larger sizes, but in no case shall the price for pea coal exceed twenty-five cents per ton. All coal less than pea coal, whatever its size, name or character when it sells for forty cents or more per ton at the mines shall be accounted and paid for at ten per cent of its price or value,

or what it sells for at the mine or works; but when worth less than forty cents per ton the coal of this size is not to be accounted or paid for."

8. Article 7 of said agreement is as follows, to wit: "The said parties of the second part, in consideration of the premises, agree to mine and take away from said land from the two upper veins, or other veins underlying the same, by or before the first day of January, A. D. 1884, twenty thousand tons, the amount paid for in advance; by the first day of January, A. D. 1885, thirty thousand tons; and in each and every year thereafter forty thousand tons, at the least, as a minimum quantity, and that amount to be paid for whether it be mined and taken away or not, until all the coal in and under said land, and contained in the several veins, which is available by prudent and skillful mining shall be mined and taken from the same; and should they fail to mine and take away annually the amount of coal hereinbefore agreed to be mined and taken away, except for causes in these articles hereinafter named and provided, they shall nevertheless pay for that amount and number of tons, and they may mine and take away an amount equal to the excess paid for by them at any time thereafter, but without interfering with or decreasing the minimum amount to be mined and paid for annually, and without further payment therefor."

9. Article 8 of said agreement is as follows, to wit: "The coal to be mined, taken away, and paid for under this agreement by the parties of the second part to the parties of the first part, after the payment down of five thousand dollars has been satisfied by coal mined and taken away to that amount as provided, shall be paid for monthly, on or before the 20th day of the month succeeding the month in and during which the coal is, or is to be, mined and taken away, after the following manner, viz: The coal mined, or to be mined, taken away and paid for during the month of January, A. D. 1884, is to be paid for on or before the 20th day of February, A. D. 1884; the coal mined or to be mined and paid for during the month of February, A. D. 1884, shall be paid for on or before the 20th day of March, A. D. 1884, and the payments be so continued monthly from month to month during the continuance of this agreement, and in all cases the full amount of coal mined and taken away monthly shall be accounted and paid for, and in no case less

than the proportionate minimum amount herein provided for, except for causes hereinafter named and provided. Until the first day of January, 1884, they are to pay for all coal mined and taken away by them beyond and in excess of the twenty thousand tons paid for by the five thousand dollars of down money, or just the amount they shall mine and take away monthly, in monthly payments as above provided, whether it be more or less than any quantity stipulated for herein, for general and subsequent payments."

10. From and including April, 1893, to and including December, 1895, the defendant mined and prepared coal from this land of different sizes each month except · during the months of August, September, October and November, 1895, when no coal was mined.

11. The defendant admits that it has not for each and every month of the time mentioned paid for at least one twelfth of forty thousand tons of coal at the rate of 25 cents per ton. Assuming that the defendant was bound each month to pay for at least one twelfth of forty thousand tons of coal at the rate of 25 cents per ton, plaintiffs prepared and offered in evidence a tabular statement showing the minimum quantity of coal to be paid for monthly at the rate of 25 cents per ton, the monthly weights of coal above pea actually returned and paid for by defendant, the deficiency and excess, as the case may be, in weights between the amount plaintiffs contend defendant was bound to pay for at the rate of 25 cents per ton and the amount actually returned, the amount paid from time to time, calculation of interest, etc. The correctness of the figures and accuracy of the calculations are admitted by the defendant, and I find that if the defendant was bound monthly to pay for at least one twelfth of forty thousand tons of coal at the rate agreed upon for coal above the size of pea coal, that is at the rate of 25 cents per ton, that it is indebted to the plaintiffs in the sum of $3,207.45 with interest from the 20th of January, 1896.

12. The defendant kept account not only of the total number of tons, but also of the number of tons of each size of coal mined and prepared by it. In some months it produced more than three thousand three hundred and thirty-three and thirty-three and one third hundredths tons of coal above the size of pea coal; in some months it produced less, and in some months none at

all. In keeping its accounts it credited the plaintiffs each month with one twelfth of forty thousand tons. When the total tonnage was less than this it apportioned to each size actually produced such number of tons of that size as was proportioned to the amount actually produced, and as would be sufficient with that apportioned to the other sizes to make up the one twelfth of forty thousand tons, and credited the plaintiffs with the number of tons thus ascertained for each size at the rate called for by the agreement for such size. When coal not yet mined was thus credited and paid for, and more than one twelfth of forty thousand tons was produced in any month, a.similar proportionate deduction was made from each size actually produced, and charged to the coal which had previously been paid for but not mined, not however reducing the amount actually paid for in each month below the one twelfth of forty thousand tons. When no coal at all was produced the plaintiffs were credited with one twelfth of forty thousand tons of coal of different sizes in the same proportion as it had been produced in the month when it was last produced.

13. It is admitted and agreed by the parties that the price of pea coal and buckwheat coal at the breaker varied from month to month, and the proportions of the same made, shipped and returned varied from month to month, and that for the months in which there was no return of pea and buckwheat coal, the defendant applied the prices of the last preceding months in which such coal was produced and returned.

14. The several returns of the defendant, in so far as they varied from the plaintiffs' contention as to the amount of coal at the rate of 25 cents per ton the defendant was bound to pay for, were received by the plaintiffs under protest. But the correctness of the returns, so far as they show the amount of coal produced, the proportionate quantity of each size, and the price per ton allowed for each size, is not in dispute.

15. Acting upon the theory that the mininum of forty thousand tons called for by the lease included coal of all sizes mentioned therein, the defendant made its payments accordingly. The correctness of the figures of the account showing the number of tons of coal of each size, and of the prices to be paid for the respective sizes, and the amounts paid from month to month, according to the defendant's theory as well as the accuracy of

the calculations based thereon, are admitted by the plaintiffs, and it is not necessary for me to find specific items in detail, and I find as a fact that from and including April, 1893, to and including December, 1895, with the exception of a small item of interest which will be presently mentioned, the defendant has paid the plaintiffs for all the coal which it mined during said time, and that it has paid the plaintiffs during said time monthly for at least one twelfth of forty thousand tons of coal of different sizes, including pea and smaller sizes of coal, as well as coal above the size of pea coal.

16. In making payments of the royalties from month to month the defendant did not always promptly pay the whole amount. which it admitted to be due, and it admits that there is due from it to the plaintiffs the sum of $46.57 interest on the delayed payments.

17. This suit was brought December 5, 1895, but the parties agree that the returns for the month of December, 1895, shall be taken into the case and considered with the other previous months, and that during said month a proportion of buckwheat coal was made but was used under the boilers in driving the engines, etc., under the 19th article of the agreement, and was not reported to the lessors for the reason that it was not subject to royalty.

### CONCLUSIONS OF LAW.

1. As already stated the question at issue between the parties is entirely one of law, and turns upon the construction to be given the agreement of January 2, 1882. Upon part of the plaintiffs it is contended that the minimum annual quantity of forty thousand tons of coal, which by the terms of said agreement the lessees or parties of the second part thereunder covenanted to annually mine and to pay for in equal monthly parts, was agreed to be coal for which the price or royalty, under the terms of said agreement, would be 25 cents per ton, that is to say, coal above the size of pea coal, while upon part of the defendant it is contended that when for any month it pays one twelfth of forty thousand tons of coal of the various sizes as produced at the rates specified for the respective sizes, it need pay for no more, unless it has mined more.

Without any unnecessary repetitions of the language of the

agreement it is proper at the outset to observe that the agreement between the parties clearly contemplates that " the operation of mining shall be so conducted as to prevent loss of the coal in any of the veins of coal in and under said lands, and to that end the two upper veins shall be mined out first " (article 3) ; that a minimum quantity shall " be paid for, whether it be mined and taken away or not, until all the coal in and under said land, and contained in the several veins, which is available by prudent and skillful mining, shall be mined and taken from the same " (article 7) ; that " the parties of the second part are to conduct their mining operations throughout in a proper and workmanlike manner, and as may be most advantageous to the parties" (article 10) ; that the " parties of the second part are to take from these lands the same proportionate quantity of lump coal that they take from their other operations in the valley," and that, " for the purpose of ascertaining the amount of coal to be accounted for and paid for under this agreement as to broken and prepared coal " certain tests shall, if required by either or any of the parties, be periodically made of the coal as it comes from the mines, and is weighed at the head of the breaker, and that " when all of the various kinds and sizes of coal resulting therefrom after going through these processes shall be weighed separately and an account of each and all the kinds and sizes taken, and the product in weight of the different kinds and sizes shall be taken as the product resulting or to result from each one thousand tons of coal thereafter mined, as it comes from the mines and is weighed at the head of the breaker " (article 4).

2. It is clear that under the agreement the lessees were bound to mine and take away at least a certain number of tons of coal within specified times, and to pay for such minimum quantity within specified times, whether the same was mined and taken away or not. This is manifest from the second, seventh and eighth articles of the agreement which have already been quoted. And there is no question that that annual minimum quantity after January 1, 1885, was forty thousand tons, and that as appears from article eighth the coal to be mined, taken away and paid for was to be paid for monthly, and that " the full amount of coal mined and taken away monthly shall be accounted and paid for, and in no case less than the proportionate minimum amount herein provided for," except for the causes named.

3. The question in the case is, what kind of coal was contemplated by the parties when they agreed upon forty thousand tons as an annual minimum which the lessees agreed to mine and pay for in proportionate monthly amounts. Its solution is not without difficulty. The agreement does not state it in express words. If the language of the agreement were transparent there would be no room for the office of construction, for there should be no construction where there is nothing to construe : Lewis v. United States, 92 U. S. 621. It is essential to ascertain the intention and meaning of the parties. There is nothing before me from which this can be ascertained except the written agreement between them. Their intention must therefore be ascertained from the instrument itself. But this intention must be gathered from the whole instrument. As one sentence may vary the meaning of another sentence, so the true meaning of a paragraph may depend upon the proper interpretation of another paragraph. The intentions of the writer have not been expressed until he has entirely finished, hence to interpret those intentions reference must be had to the whole writing : 11 Am. & Eng. Ency of Law, 514.

It is too plain for argument that the parties to this agreement contemplated and intended that coal of different sizes should and would be produced. It speaks of lump coal, or coal as it comes from the mines, unbroken and unscreened, and of broken and prepared coal, of pea coal, and coal larger as well as coal smaller than pea coal, and provides how prepared coal shall be screened and assorted. It provides that the weight of each size shall be ascertained, and how it shall be ascertained, and requires the lessees " to render an account of all coal mined and taken from said land during each and every month, and to make and prepare two monthly statements showing the amount of each of the various sizes of coal taken from said lands ; and the weight of all coal weighed at the head of the breaker during said month, and to be paid for under this agreement." This is made still more prominent by those parts of the agreement which provide that different prices shall be paid for different sizes of coal and fixing the price for all coal above the size of pea coal at 25 cents a ton, for pea coal a price proportioned to the price it is worth at the works with what the larger size is worth at the same place, and for the smaller sizes, ten per cent of their value when they sell for forty cents a ton or more at the mine.

I fail to find any words or language in the agreement expressly defining the kind of coal which is to constitute the annual minimum amount agreed upon, and if there were nothing else in the case I think it would be fairly inferred that the parties intended that the minimum number of tons to be paid for were intended to be made up of the different sizes of coal produced in the proportion that they are produced by the ordinary, usual and careful mining and preparation of coal in accordance with the terms of the agreement.

Objection is made to such rule that while it would work well in case the lessees produced in each month three thousand three hundred and thirty-three and thirty-three and one third hundredths or more tons, above the size of pea, in case they produced less than that amount of said size, or in case none at all were produced as in the present case for August, September, October and November, 1895, the application of the rule would be impossible.

This objection overlooks entirely the fact that it may be shown by expert testimony what the proportion of the coal would be if produced as required by the agreement.

It is a fact well known, a fact known to the parties when they signed this agreement, as is evidenced by the agreement itself, that in the ordinary, careful mining and preparation of anthracite coal, coal of different sizes is produced. The proportion to each other of the different sizes produced may not always be the same, but when, as in the present case, three sizes are expressly, and it might be said, arbitrarily recognized and established, namely pea coal, coal above the size of pea coal, and coal smaller than pea coal, and pea coal is by express contract defined to be "coal of a size that passes over a mesh in the screen of one half an inch in the clear, and that passes through a mesh in the screen that is three fourths of an inch in the clear," and the parties agree that for the purpose of ascertaining the amount of coal to be accounted for and paid for, a thousand tons of coal as it comes from the mines shall in each quarter year, at the request of either party, be run through the breaker and screens at the works in the ordinary manner and at the usual rate of speed, by some competent person, etc., and that "all of the various kinds and sizes of coal resulting therefrom after going through these processes shall be weighed separately and

an account of each and all the kinds and sizes taken, and that the product in weight of the different kinds and sizes shall be taken as the product resulting, or to result from each one thousand tons of coal thereafter mined, as it comes from the mines, and is weighed at the head of the breaker, and broken and screened as provided for the three months following," there is no difficulty in ascertaining what the actual proportion is, or what the proportion to be ascertained in the manner agreed upon would be.

There is no expert testimony on this question before me, and there is no evidence that the test provided for by the agreement has been made, but it is proper to state that as I understand the plaintiffs' position they make no objection to the correctness of the proportion of the different sizes of coal accounted for by the defendant according to its construction, but that they do object that such proportions cannot be ascertained by expert testimony, or by the test agreed upon in article 4, or by the method adopted by the defendant or by any other means, during months when no coal was mined.

But there are other provisions of the agreement to be considered. Chief among these is article second, which requires the lessees, among other things, to pay $5,000 as an advance payment on the coal to be mined and taken out under the agreement, and which provides that said amount "is to be allowed and accounted for out of the coal mined, taken away and disposed of prior to the 1st day of January, 1884, and article 5 which provides that the lessees shall pay the sum of 25 cents per ton for all coal above the size of pea coal, and article 7 which is as follows : "The said parties of the second part in consideration of the premises, agree to mine and take away from said land from the two upper veins, or other veins underlying the same, by or before the first day of January, A. D. 1884, twenty thousand tons, the amount paid for in advance ; by the first day of January, A. D. 1885, thirty thousand tons ; and in each and every year thereafter forty thousand tons, at the least, as a minimum quantity, and that amount to be paid for whether it be mined and taken away or not, until all the coal in and under said land, and contained in the several veins, which is available by prudent and skillful mining, shall be mined and taken from the same ; and should they fail to mine and take away annually

the amount of coal hereinbefore agreed to be mined and taken away, except for causes in these articles hereinafter named and provided, they shall nevertheless pay for that amount and number of tons, and they may mine and take away an amount equal to the excess paid for by them at any time thereafter, but without interfering with or decreasing the minimum amount to be mined and paid for annually, and without further payment therefor."

It is contended by the learned counsel for plaintiffs, that inasmuch as the agreement disposes of all the coal on the land at a price to be paid for at some rate or other, the only purpose of fixing a minimum quantity could be to assure the lessors of the payment of the consideration in such a way as to provide them with a certain annual income, and, because the $5,000 paid down are to be allowed and accounted for out of the coal mined and taken away prior to January 1, 1884, and the lessees " agree to mine and take away from said land from the two upper veins, or other veins underlying the same, by or before the first day of January, A. D. 1884, twenty thousand tons, the amount paid for in advance," and the lessees agree to pay 25 cents per ton for all coal above the size of pea coal, that the only way to assure to the lessors a fixed annual income would be to require the lessees to pay for the minimum number of tons at the rate of 25 cents per ton.   Of course a fixed minimum number of tons at 25 cents per ton would assure to the lessors a certain minimum annual income.   But is that what the parties intended ?  It seems to me that the contention for a certain or fixed minimum annual income is only stating the question at issue in another form.   That the minimum number of tons to be paid for at some price or other was intended to assure some annual income to the lessors is conceded, but the amount of that income depends entirely upon the character of the coal which is to be paid for.

It is argued, however, that inasmuch as the advance payment of $5,000 paid for twenty thousand tons, this necessarily fixes the rate for each ton at 25 cents, and that the expression " the amount paid for in advance " is equivalent to the expression " at the rate of 25 cents per ton," and that this equivalent should be carried to each ton of the minimum required to be paid for subsequently.   From a mathematical standpoint there

is no difficulty in saying that if twenty thousand tons cost $5,000, one ton will cost 25 cents, but what is there in the agreement to show that this coal was paid for at that rate per ton and not as whole consideration for the whole or lump amount? The agreement expressly says that the $5,000 is an advance payment on the coal to be mined and taken out, and that the lessees should be allowed until January 1, 1884, to mine and take away said coal, and that the amount should be allowed and accounted for out of coal mined and taken away prior to January 1, 1884, and that the lessees agree to take away said twenty thousand tons before January 1, 1884.

It may be true that if the expression "the amount paid for in advance" is equivalent to the expression "at the rate of 25 cents per ton," and that if this equivalent expression were substituted into article 7, it would make that article read to the effect that the lessees were to pay for the number of tons therein mentioned at the rate of 25 cents per ton, but I do not see my way clear to do this. We cannot read into a written instrument what is not there. There is no evidence before me to show what was the mutual or contemporaneous construction of the agreement that the lessees should mine and take away from the two upper veins or other veins underlying the same twenty thousand tons, "the amount paid for in advance," but judging from the agreement itself this amount of coal was to be taken from the two upper veins if in the judgment and discretion of the lessees it could be properly done.

It does not seem to have been the purpose of the parties, by article 7, to fix the rate per ton of coal already paid for or to be paid for in the future. So far as the twenty thousand tons are concerned, they were paid for by the down payment mentioned in article 2. Article 2 fixes the price to be paid for the twenty thousand tons, while the rate per ton to be paid after these twenty thousand tons had been mined, or after the time within which they were to be mined, had expired, is fixed by article 5, and the time and manner of payment is fixed by article 8. The parties appear to have intended a difference between the amount and manner of payment for the twenty thousand tons, and the manner and amount to be paid for subsequent coal. In the last sentence of article 8 it is provided that "until the 1st day of January, 1884, they (the lessees) are to pay for all

coal mined and taken away by them beyond and in excess of the twenty thousand tons paid for by the $5,000 of down money, or just the amount they shall mine and take away monthly, in monthly payments as above provided, whether it be more or less than any quantity stipulated for herein, for general and subsequent payments." And the purpose of article 7 was evidently to limit the period within which the twenty thousand tons could be taken away without further payment than had already been made, and to require the lessors to mine and take away each year after that period, a certain number of tons of coal, and to pay for the same, whether mined and taken away or not. None of the provisions of article 7 providing for the payment of coal whether mined or not, and none of the provisions of article 8 relating to the manner in which the payments are to be made, relate to the twenty thousand tons to be mined in satisfaction of the $5,000 down payment.

Returning to the main question, as bearing directly thereon, it is proper to keep in mind that there are two parties to this agreement. The rights of the lessors cannot be larger or greater than the duty or obligation of the lessees. It is too plain for argument that under this agreement the minimum amount of money which the lessors are entitled to receive for royalties, in case less than the specified number of tons of coal are mined, will necessarily be the maximum amount of money which the lessees are obliged to pay. And yet, if the construction contended for by the plaintiffs be correct, the lessees might be obliged to pay for more than the minimum called for by the express language of the agreement. As said before in the ordinary and careful mining and preparation of coal, such as is contemplated by this agreement before me, coal of different sizes is necessarily produced. The agreement expressly provides for different prices for at least three sizes. For the size above pea coal as defined by the parties the price is arbitrarily fixed at 25 cents per ton. The price for pea and smaller sizes is put upon a sliding scale, and depends to some extent upon the value of the sizes at the mine when produced. Under the terms of the agreement, as I understand it, the lessees are obliged to pay for the smaller sizes at the rates agreed upon. If plaintiffs' contention be correct, and the lessees produce less than forty thousand tons of coal larger than pea, they are obliged to pay,

not only for the full amount of forty thousand tons of that size, but also for the full amount of the smaller sizes which they necessarily produce with it. It might easily occur, not only that the whole number of tons produced would exceed forty thousand, but also that the amount which the lessees would be obliged to pay would exceed the amount they are required to pay for forty thousand tons at the rate of 25 cents per ton.

Twice in the 2d article and twice in the 7th article the parties have specified the minimum number of tons to be mined, after the expiration of the time fixed for the mining of the twenty thousand tons paid for by the down payment of $5,000, and in no instance and nowhere have they expressly stated at what rate or in what proportion these tons were to be paid for. The absence of the words "at the rate of 25 cents per ton" is significant, and I cannot resist the conclusion that the parties did not intend that the minimum of forty thousand tons should be paid for at the rate of 25 cents per ton, but that they did intend that the forty thousand tons minimum should be made up of coal of the three sizes already mentioned, in such proportion as it is or can be produced by the ordinary, usual and careful mining and preparation of coal according to the terms of said agreement, and that the different sizes making up the whole number of tons should be paid for at the rate fixed or prescribed by the agreement for each size.

In conclusion, I find that the plaintiffs are entitled to judgment for the sum of $46.57. And now, March 21, 1896, it is ordered that the prothonotary of said court forthwith give notice hereof to said parties or their attorneys, and that if no exceptions hereto be filed in the office of the prothonotary within thirty days after service of such notice, judgment be entered hereon by said prothonotary in favor of the plaintiffs and against the defendant for the sum of $46.57.

*Error assigned* was entry of judgment as above.

*Alexander Farnham, J. D. Farnham* with him, for appellants.

There was no evidence aliunde the lease from which it could be positively shown or inferred that the deficiencies in monthly production of coal should be apportioned among the different sizes in connection with the payment of minimum royalty.

The lease (article 8) says that the payments of royalty shall be monthly from month to month, and that "in all cases the full amount of coal mined and taken away monthly shall be accounted and paid for, and in no case less than the proportionate minimum amount herein provided for" (forty thousand tons annually). This language must be taken as meaning that the proportionate amount to be paid for each month in any event is three thousand three hundred thirty-three and one third tons.

The answer of de minimis cannot avail here. A principle should stand whether applied to large or small interests. Nor is the royalty on pea coal and the smaller sizes in this case a matter de minimis. The defendant's returns show this.

In view of the aspect of the case, as presented by the judge, two questions become pertinent:

1. Is parol evidence admissible to show, by what he styles "expert testimony," or by reference to other collieries, or to the average production of the region or by proof of any kind, what the proportions and prices of minimum deficiencies should be for this colliery, during periods of time when either less than the minimum, or no coal at all, is mined?

2. If such evidence is admissible, upon whom does the burden of proof lie?

The first question is of the greatest importance, for if the proper proportions and prices can be thus shown during such periods, the several provisions for the payment on the minimum annual production in monthly proportions might be held as capable of being carried into effect, and the provisions in question as being self sustaining. The contract is made for this property and mine works alone.

The second question is: If such evidence is admissible, upon whom should the burden of proof fall? The plaintiffs made out their case when they showed, prima facie, that the defendant's returns were made upon a principle manifestly wrong. The plaintiffs' contention not having been rebutted by material evidence, the defendant should have been taken as not contesting by any available defense, and the judgment should have been accordingly.

The purpose of securing a fixed minimum of money is apparent as a necessary logical conclusion from the provision for a fixed minimum of coal to be mined. It is a conclusion to which

we are impelled by the considerations that naturally exist in connection with a requirement as to a minimum quantity.

*George S. Ferris,* of *Ferris, Flick & Urquhart,* for appellee, cited as to the construction of the lease: Phila. Trust etc. Co.'s App., 108 Pa. 311; Bedford's App., 126 Pa. 117; Wharton v. Fisher, 2 S. & R. 178; Ludwig v. Leonard, 9 W. & S. 44; Hazelton Coal Co. v. Buck Mountain Coal Co., 57 Pa. 301; Frazier v. Monroe, 72 Pa. 166; Phillips v. Meily, 106 Pa. 536; Murray v. R. R. Co., 103 Pa. 37; Thomas v. Loose, 114 Pa. 35.

PER CURIAM, April 27, 1896:

For reasons given in the opinion of the learned judge of the 45th judicial district who specially presided at the trial of this case, we think there is no error in the record that requires either modification or reversal of the judgment.

Judgment affirmed.