## Lacoe et al., Appellants, *v.* Lehigh Valley Coal Co.

*Mines and mining—Coal lease—Royalties—Lump coal—Pea coal—Mimimum rental.*

1. Where a coal lease stipulates for the payment of a minimum rental per year and further provides that "forty per cent of the production shall be lump coal and whenever at any settlement it shall be found that the prepared coal is in excess of sixty per cent of the whole production, the rental for such excess of prepared coal shall be ascertained by adding twenty-five per cent to the rentals upon such excess," the minimum rental paid in advance of production cannot be applied to the payment of ′the additional rentals to be paid in the excess production of prepared coal.

2. In such case, where it appears that the purpose of the lump coal provision was to prevent large coal from being cut down into small sizes, and the court finds that during a long period of years there was never in any one year lump coal mined to the amount of forty per cent of the whole production, and that the lessor had never in any way acquiesced in this course of business, the lessee will be required to pay the additional rental on the excess production of prepared coal.

3. The fact that there was no demand for the larger size will not release the lessee, inasmuch as he cannot claim to be relieved of the contract because it was difficult to perform.

4. The excess payment was not in royalty or an increase of royalty, but was a distinct and separate sum of money, in the nature of a penalty, to be paid compulsorily to the lessor for not producing the required amount of lump coal.

5. Where a coal lease fixes a certain rental for pea coal, and defines pea coal as a "coal which passes with the dirt through a screen of three quarters of an inch mesh," and the lessee admits that it mined and sold coal known as buckwheat, rice and barley coal, all of which passed through a screen of three quarters of an inch mesh, it cannot allege as a ground for not paying royalties on such coal that the sizes specified were not known as pea coal at the time the lease was made.

6. In such case while the lessors will be required to pay for the pea coal at the royalty specified for such coal in the lease, the lessee cannot claim that it is excluded from the minimum royalty specified in the lease covering all coals specified therein.

7. The clause in question was inserted to protect the lessee from the payment of the same rental for pea coal as it was obliged to pay for prepared sizes over pea coal.

8. Where a coal lease provides for a minimum production of a certain number of tons per year, and nothing is said in the lease as to the sizes of the coal constituting the minimum annual production, it may be inferred that the parties intended the minimum number of tons to be paid for were to be made up of the different sizes of coal produced in the proportion that they are produced by the ordinary, usual and careful mining and preparation of coal in accordance with the terms of the agreement.

9. Pea coal used by the lessees for fuel purposes in the production of coal mined under the terms of the lease must be taken and computed as a part of the minimum production and to be accounted for and paid in royalties the same as all other coal mined and shipped to the market.

Argued May 11, 1927. Before FRAZER, WALLING, SIMPSON, KEPHART and SADLER, JJ.

Appeals, Nos. 20 and 22, Jan. T., 1927, by plaintiffs and defendant, from judgment of C. P. Luzerne Co., Jan. T., 1911, No. 57, on case tried without a jury, in suit of Ralph D. Lacoe et al. v. Lehigh Valley Coal Co. Affirmed.

Assumpsit for coal royalties. Before JONES, J., without a jury.

The opinion of the Supreme Court states the facts.

Judgment for plaintiffs for $133,507.50, being for certain royalties allowed. Both plaintiffs and defendant appealed.

*Error assigned* in each case was judgment, quoting record.

John P. Kelly, of *O'Brien & Kelly* and *Henry A. Knapp*, of *Knapp, O'Malley, Hill & Harris*, with them *Paul Bedford*, for Ralph D. Lacoe et al.—Under the terms of the lease the lessee was not entitled to include the "pea coal" in the minimum tonnage and thus avoid paying royalty on the "pea coal": Hull v. Coal Co., 255 Pa. 233; S. Coal Co. v. Searle, 248 Pa. 385.

The lease must be construed in the light of the circumstances at the time of its execution, June 1, 1868: Lehigh Val. Coal Co. v. Searle, 248 Pa. 385.

The construction of the lease by the parties indicates that the royalty on pea coal was not to be included in the minimum.

The decisions of this court amply sustain the proposition that fuel coal under the terms of this lease is not to be used by the lessee free of charge: Glick v. Coal Co., 221 Pa. 428; Hull v. Coal Co., 255 Pa. 233; Coxe v. Heisley, 19 Pa. 243.

The semi-annual payments of minimum rentals were not semi-annual "settlements." They did not purport to be. The parties assumed, and rightfully assumed, that they were simply receipting for what they got. Acceptance of the minimums did not constitute a waiver of the other claims of the lessors: Corona Coal & Coke Co. v. Dickinson, 261 Pa. 589.

*P. F. O'Neil*, with him *F. W. Wheaton*, for Lehigh Valley Coal Co.—When the provisions of a coal lease, relating to royalties, are obscure and are susceptible of two different meanings, and the lessor for a long time has accepted payment of royalties on a basis determined by one construction of the lease, he will not be permitted to set up another construction and claim royalties based upon such construction: McKeever v. Coal Co., 219 Pa. 234.

OPINION BY MR. JUSTICE FRAZER, June 25, 1927:

Both parties to this action have appealed from the judgment and decree of the lower court, where the case was tried without a jury. The questions involved are practically the same in both appeals and will be disposed of in one opinion. The questions for determination arise from conflicting interpretations of a coal mining lease, executed June 1, 1868, between the predecessors of the parties, the coal land being situated in Luzerne County anthracite coal region, and embracing several tracts comprising a total of about 565 acres. By virtue of various assignments, transfers and operation of law, the interests of lessors have become vested in plaintiffs below and those of lessees in the Lehigh Valley Coal Company, defendant. The conclusions of law reached by the learned judge at the trial embrace the controlling questions in dispute, and as practically all material facts were agreed to at the trial by the respective parties, and the issues thus greatly simplified, the court below had chiefly for its determination the interpretation of those sections of the lease which govern the adjustment of tonnage and the payment of royalties as they apply to the coal mined under the lease.

By the terms of the contract lessee was given the right to take out "all the merchantable coal upon the premises," by proper, skillful and careful working, "until all the coal shall have been mined and exhausted"; and it provided that lessee shall pay to lessors $16,000 per annum (excepting less amounts in the first three years), for which lessee is to have the right to mine and remove 100,000 tons of coal annually, the royalty being thus sixteen cents per ton; but if in any one year more than 100,000 tons and less than 200,000 tons are mined the rental or royalty shall be fifteen cents per ton and if 200,000 tons or more are produced fourteen cents per ton; and if in any one year royalties be paid and sufficient coal not mined therefor, the deficit may be mined in any subsequent year; with an exception to the

above named royalty provided in clause five of the lease to the effect that the royalty on pea coal shall be half price or eight cents per ton and another provision that forty per cent of the whole annual production shall be lump coal, and if the other coal produced is found to exceed sixty per cent of the whole output, the royalty on such surplus shall be ascertained by adding twenty-five per cent to the royalty on that amount.

No questions of fact as to the yearly and total tonnage mined being in dispute, the statements showing an output or payments of the stipulated minimum royalty of $16,000, the questions to be determined are those of law, involving the interpretation of the lease as it must have been intended to operate at the time of its execution.

Plaintiffs first claim they are entitled under the lease to twenty-five per cent additional royalty on prepared coal in excess of sixty per cent of the total production, which claim is based on the very clear provisions of the sixth clause of the lease which says: "Forty per cent of the production shall be lump coal and whenever at any settlement it shall be found that the prepared coal is in excess of sixty per cent of the whole production, the rental or royalty for such excess of prepared coal shall be ascertained by adding twenty-five per cent to the rentals upon such excess." There should be no doubt as to the proper interpretation of this clause. Of all coal mined annually, whether 100,000 tons or less, forty per cent shall be lump coal and the aggregate of other grades of coal is not to be over sixty per cent; but if it is found at "any settlement" that the amount was over sixty per cent then to the total of the fixed royalty on that excessive output of prepared coal an amount equal to twenty-five per cent of that excess royalty is to be added. The court below found there never was in any one year, since the lease began, lump coal mined to the amount of forty per cent of the whole production. In fact, there was only a negligible quantity ever produced

and finally in the year 1898 production was abandoned entirely. Notwithstanding there was at first very little and finally no lump coal produced, manifestly there was an open and flagrant violation of the terms of the lease governing the subject of such coal. As the evidence shows, this matter was at no time adjusted or even considered with definiteness at any settlement between the parties. It seems to have been vaguely touched upon at one or two meetings of their representatives, but nothing final as to the disposition of the matter was reached, nor were formal protests or complaints made by lessee against the exaction of this requirement. There was, however, a letter produced in evidence from lessee's mine superintendent to the representative of lessors, written in 1873, in which it was stated that he "entertained grave doubts whether any allowance should be made on that account," that the character of the coal was such that "we cannot make a greater proportion of lump coal," and he included in the communication a personal interpretation of the lease, to the effect that "The clause of the lease was made to prevent any unnecessary waste through breaking down coal that could be sold as lump." It is claimed by lessee that by the acceptance of this letter and of successive statements of mining operations, remittances of royalty payments and vouchers, lessors "acquiesced in the opinion of lessee that the veins were not suited to the production of lump coal in considerable quantities." We find nothing, however, in the evidence to show that the act of "acceptance" of the letter can be twisted into an excuse for and an acquiescence in the plain failure or negligence of lessee to produce lump coal to the extent of forty per cent of the total output. The letter of the superintendent can mean nothing in connection with the interpretation of the lease. It is merely in the nature of a lament and a rather obvious rejection of the lump coal requirement, an indirect effort to evade that provision; while as to the statements and other papers in evidence, the

trial judge found that "an inspection of the vouchers will disclose that they purport to be simply payments of the semi-annual minimum rentals and not semi-annual settlements or receipts in full." Moreover, the very first statement of mining operations under the lease, dated June 24, 1872, the production of lump coal of the required amount and the mining of prepared coal over the sixty per cent limit was set forth and acknowledged. Here then at the start of the life of the contract was a plain recognition and acceptance of the lump coal stipulation, so that when lessee during all the forty years since the beginning of operations under the contract failed and neglected to produce the required quantity of lump coal, but broke it down into smaller sizes, for the reason, given in the testimony, that there was no market for lump coal, there resulted an unquestionable disregard and violation of the lump coal clause, by which violation defendant rendered itself liable for the payment of the additional sum equal to twenty-five per cent of the royalty on the excess production of prepared coal. It must be assumed lessee was acquainted with the many contingencies that inevitably arise in coal mining operations, and if it were not prepared to meet them, had not anticipated them, or found the mining of lump coal unproductive of expected financial returns, the consequences of such negative factors rest upon defendant itself. It accepted the plain terms of the lump coal clause, which plainly demands a production of forty per cent of that grade of coal and which provides a sort of penalty for its nonproduction in the shape of the twenty-five per cent additional payment, and having decided to ignore, and finally ignoring, its provisions, we are constrained to affirm the conclusion of law of the trial judge that "defendant must pay an excess of rental on such excess production." "The rights of the parties must be measured by the contract which they themselves made. A contract is not invalid, nor is the obligor therein in any manner discharged from its binding effect because it

turns out to be difficult or burdensome to perform. Nor will unforeseen difficulties, however great, excuse him": 6 R. C. L. 997.

It is claimed by defendant that, admitting there was a failure to produce forty per cent of lump coal, it has in fact already paid that additional excess royalty in minimums, and consequently that sum is not something for which defendant must pay, over and above what it has already paid in minimum royalties. Defendant reaches this contention by arguing that since there were years during which it did not mine the minimum annual amount of 100,000 tons, but regularly paid the annual royalty of $16,000, it in fact paid for more coal than was removed, and hence if there is to be an addition of twenty-five per cent exacted for failure to mine the required amount of lump coal, this additional amount was covered and paid for in the minimum payments made for coal never produced. But that is not what a proper construction of the lease contemplates. Defendant agreed to pay a minimum royalty of $16,000, not on or for any particular quantity of coal, but for the right to mine 100,000 tons a year, and if it mined less or none at all, it failed to take advantage of the right so secured. However, it still, by the terms of the lease, possessed that right and could continue to possess it. To do that it was not essential that a ton of coal be mined, if it chose to pursue that course, but it was required to continue the regular payments to lessors of $16,000 royalty annually. Inasmuch as it never failed to pay that amount in any year, it did not forfeit its right to mine coal. The defect in defendant's reasoning is that it construes clause six of the lease to mean that the twenty-five per cent "to be added to the rentals" was in fact an additional royalty, or an increase of the fixed royalty of 16 cents on prepared coal and eight cents on pea coal per ton. The contract contains nothing to sustain even remotely such interpretation. By its terms the lessee is authorized to take out 100,000 tons a year, and the

royalties for so doing are fixed and established by the contract, and the only change anywhere allowed in these fixed rentals, is that set forth in clause three, where it is provided that if 100,000 tons or less than 200,000 are produced in any one year the royalty is reduced to fifteen cents, and if 200,000 tons are mined the reduction shall be to fourteen cents. The twenty-five per cent additional payment for producing less than forty per cent of the output is something quite different. Instead of being a royalty or an increase in royalty, it is a distinct and separate sum of money, in the nature of a penalty, to be paid compulsorily to lessors for not producing the required amount of lump coal. Lessee at no time made such production of that grade of coal, and hence incurred the penalty of paying, not an increased royalty, but a sum to be computed and paid, for not fulfilling the requirement of the lease. It broke down the lump coal it mined into smaller sizes, and thus incurred a punishment, and the reason why this punitive clause was inserted in the contract is, in the words of the court below, "because it was manifest to the parties that breaking down lump coal necessarily increased the smaller sizes, created dust and waste and decreased the royalty yield from the vein; therefore, they made the production of lump coal the subject of a special provision, securing the lessors from a loss of rental in case lump coal should not equal at least forty per cent of the whole production." We cannot therefore see how, by any logical conclusion, or by a reasonable construction of the lease, the amount now claimed to be due by defendant by reason of its neglect to mine the required quantity of lump coal, has sunk into the fixed royalties and has been included in and already compensated for by the payment of minimum royalties. We accordingly affirm the conclusion of law of the court below that "the excess sums for excess production of prepared coal over lump coal cannot be applied on the minimum rental of $16,000 per annum; defendant must pay in addition to

the minimum rental of $16,000 the excess rental of twenty-five per cent for breaking down lump coal and increasing the production of prepared coal."   .

Lessee further contends that the provision in the lease exacting a royalty of eight cents a ton on pea coal, which is one-half of the royalty on all coal of larger size, should not be so interpreted as to include, and make subject to that eight cents rental, all the coal of smaller size that passed with the pea coal through a screen of a required mesh. It insists that coal of less size than pea coal which passed through the mesh was in fact coal mined and sold in the market under other designations than pea coal, and since the contract provides that only coal of pea character is subject to the eight cents royalty, the lesser sizes, not being pea, which passed through the mesh and were sold and shipped under other names, are exempt from the exaction of the royalty. The lease does not so state; it says precisely the reverse. Exactly what is to be mined and accounted for as pea coal under this lease is concisely and plainly defined by the language of that instrument itself. It says: " 'Pea coal' is hereby defined to be that coal which passes with the dirt through a screen of three-quarters inch mesh." As is well-known, pea coal is not the smallest grade of coal mined and sold in the market. Various lesser sizes, known by different names, are produced and sold, and we find by the testimony in this case that as a matter of fact lessee mined and sold to the public, beginning some years after the execution of the lease, grades of smaller size than pea, known then and now as "buckwheat," "birdseye," "rice" and "barley," all of which smaller sizes passed, in the operation at the mines in question, with the pea size through the three-quarters inch mesh, the mesh as designated by the lease itself. But it is contended by defendant that any and all sizes of coal, smaller than pea, which passed with the size known as pea coal through the prescribed screen is in fact to be considered as "dirt," which would "be thrown

upon the dirt bank and would pay no royalty." It is quite evident however from the record in the case that the sizes smaller than pea were not thrown upon the dirt bank, as we find it unreservedly admitted in defendant's affidavit of defense, that "during a large portion of the time" other coal of less size than pea was regularly produced and accounted for, under the names of "buckwheat" and the other designations given above. But it is not a matter of concern in the present discussion what might be the names of the sizes produced by lessee under the pea coal size. The meaning and intent of the lease manifestly is that the kind of coal which is to pass through a three-quarter inch mesh is simply and only "pea coal," upon which a royalty of eight cents per ton is to be paid. If after this coal has passed through the designated mesh lessee found it could be assorted into pea coal and other sizes smaller than pea, and put on the market, that was quite another matter not to be taken into consideration in this discussion. It was pea coal, and only pea coal, which under the definition of the lease, was to be considered as having been screened, "with the dirt," through that special mesh, and it was this coal, comprising all sizes passing through the mesh, that made up and was to be accounted for as pea coal tonnage. The trial judge so found as a matter of law and supports his conclusion by the interpretation of a precisely similar provision in a coal lease in Glick v. Lehigh Valley Coal Co., 221 Pa. 428. There it is held that where a coal lease fixes a certain rental for pea coal and defined pea coal as a "coal which passes with the dirt through a screen of three-quarters of an inch mesh," and the lessee admits that it mined and sold coal known as buckwheat, rice and barley coal, all of which passed through a screen of three-quarters of an inch mesh, it cannot allege as a ground for not paying royalties on such coal that the sizes specified were not known as "pea coal" at the time the lease was made, or at the present time, or were not pea coal as

defined in the lease. For more than thirty years lessee in the case before us has been producing and selling buckwheat and other sizes smaller than pea, all of which passed through the pea coal screen. Within the plain meaning of the lease all such coal was, in character, pea coal, and defendant cannot be relieved from paying therefore the pea coal royalty of eight cents per ton, as stipulated in the lease.

Having thus determined as did the trial judge, what is pea coal as defined by the lease and that coal of this character is subjected to the eight cents royalty, we are met by plaintiffs' claim that such coal tonnage, as made up of all sizes that pass through the three-quarters inch mesh, is not to be accounted for as a part of the minimum quantity of 100,000 tons which lessee may mine annually but that a proper construction of the lease excludes it entirely from such accounting and that the eight cents a ton royalty upon this coal is a separate royalty, to be computed apart from and additional to the stipulated minimum royalties. This contention is untenable. To use the words of the learned trial judge, in disallowing this claim by plaintiffs, "The pea coal clause was inserted to protect the lessee from the payment of the same rental for pea coal as it was obliged to pay for prepared sizes over pea; if it were not for this clause, reducing the rentals to one-half, defendant would be obliged to pay the full rental of sixteen, fifteen or fourteen cents per ton for pea coal. The tonnage of 100,000 tons stipulated in the lease contemplates coal of all sizes mined and shipped under the terms of the contract, not coal of any designated size, but manifestly coal of the run of the breaker......If the parties intended that pea coal should be eliminated from the minimum tonnage they could have said so, and the only inference to be drawn from the absence of such stipulation, the conduct of the parties and the agreement itself, is that the parties intended that the minimum was to be made up of the different sizes of coal produced in the proportion they are produced by the ordinary, usual,

careful mining, in accordance with the terms of the lease." Nothing is said in the lease in the present case relative to the sizes of coal that are to make up the minimum annual production, and we can find no grounds in the terms of the lease or in the acts or statements of the parties, for the inference that it was the intention of the parties to the contract that a differentiation should be made whereby pea coal was not to be included in the minimum tonnage. Plainly it was understood by the original parties to the lease that if, to use the illustration of the court below, forty per cent of lump coal and sixty per cent of prepared coal were mined, the sixty per cent of prepared coal must necessarily include the pea coal. In the determination of a similar claim under a coal lease we said in Schooley v. Butler Mine Co., 175 Pa. 261, that "where a coal lease provides for a minimum production of a certain number of tons per year, and nothing is said in the lease as to the sizes of the coal constituting the minimum annual production, it may be inferred that the parties intended the minimum number of tons to be paid for were intended to be made up of the different sizes of coal produced in the proportion that they are produced by the ordinary, usual and careful mining and preparation of coal in accordance with the terms of the agreement." The same interpretation applies here and we concur in the conclusion of the trial judge in disallowing this claim to plaintiffs.

As to plaintiffs' contention that royalties should be paid them for pea coal used for fuel purposes in the production of coal mined under the terms of the lease, we are in accord with the conclusion of the court below in allowing this claim, to the extent that the fuel coal used for fuel purposes is to be taken and computed as a part of the minimum production and be accounted for and paid for in royalties the same as all other coal mined and shipped to the market, under the terms of this lease.

All assignments of error are overruled and the judgment of the court below is affirmed.